IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY TITUS,<br><br>              Plaintiff,<br><br>vs.<br><br>MICHAEL UNGER and STANTON COUNTY, NEBRASKA,<br><br>              Defendants. | 8:12CV261<br><br>ORDER |

This matter is before the court on the defendants' Motion for Summary Judgment (Filing No. 47).[1] The defendants filed a brief (Filing No. 51) and indices of evidence (Filing Nos. 48, 49, and 50) in support of their motion. The plaintiff filed a brief (Filing No. 67) and an index of evidence (Filing No. 68) in response. The defendants filed a brief (Filing No. 72) and an index of evidence (Filing No. 71) in reply.

This matter is also before the court on the defendants' Motion for Protective Order (Filing No. 74). The defendants filed a brief (Filing No. 75) in support of the motion.

## INTRODUCTION

This matter arises from injuries Ashley Titus (Titus) sustained when Titus was ejected from Stanton County Sheriff Michael Unger's (Sheriff Unger) patrol car during transport to the Stanton County Sheriff's Office (SCSO). On July 31, 2012, Titus filed her Complaint asserting civil rights violations under 42 U.S.C. § 1983 and state law claims. **See** Filing No. 1 - Complaint. On September 13, 2012, Titus filed an amended complaint, which is the operative complaint for this matter. **See** Filing No. 8 - First Amended Complaint. In response, the defendants filed a motion to dismiss. **See** Filing No. 9. On April 22, 2013, the court entered an order on the defendants' second Motion to Dismiss. **See** Filing No. 20 - Order. The court dismissed Titus' claims for false arrest and false imprisonment (Count III), excessive force (Count V), and deliberate indifference to providing medical care (Count IV). **See** *id.* Titus' remaining claims are:

---
[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 25.

Count I- Unlawful Policy, Custom, or Habit; Count II- Negligence; Count IV- Cruel and Unusual Punishment: Failing to Provide Medical Care (Stanton County and Unger);[2] Count VI- Negligent Training and Supervision (Stanton County); and Count VII- Policy, Custom, or Habit (Stanton County and Unger). The defendants filed an answer generally denying Titus' allegations. **See** Filing No. 22 - Answer.

On September 13, 2013, the defendants filed the instant Motion for Summary Judgment on the basis there are no genuine issues of material fact and Sheriff Unger is entitled to qualified immunity. **See** Filing No. 47 - Motion. The defendants argue Sheriff Unger's conduct did not amount to deliberate indifference and the facts in Titus' First Amended Complaint are insufficient to support Titus' purported ***Monell***[3] and negligence claims. **See** Filing No. 51 - Brief. Titus argues Sheriff Unger is not entitled to qualified immunity and inadequate discovery has been obtained to support or deny the defendants' Motion for Summary Judgment. **See** Filing No. 67 - Response.

## UNCONTROVERTED FACTS

The following facts are those stated in the parties' briefs, which have been admitted or not properly resisted, and those facts as supported by the record. **See** NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1)(A) and (e)(2).

1. Titus is a resident of Norfolk, Nebraska, and was nineteen years of age on August 29, 2010. **See** Filing No. 49-1 - Titus Depo. p. 3:9-18. Titus dropped out of high school in the 9th grade, but obtained a GED, and was enrolled at Northeast Community College for the 2010 fall semester. ***Id.*** at 5:22-6:25; 9:1-11.

2. Titus, at the time of her encounter with Stanton County law enforcement on August 29, 2010, was under bond out of Madison County, Nebraska, for shoplifting and assault, conditioned upon her not getting into further trouble with the law. ***Id.*** at 7:16-17; 24:20-25:6.

---

[2] The defendants' second Motion to Dismiss was granted with respect to the portion of Count IV of Titus' First Amended Complaint alleging deliberate indifference in failing to provide necessary medical care but was denied with respect to the portion of Count IV alleging deliberate indifference to the plaintiff's safety while in custody. **See** Filing No. 20 - Order p. 12.
[3] ***Monell v. Dep't of Soc. Servs.***, 436 U.S. 658 (1978).

3.      Titus previously fled from a crime scene where she knew she would be arrested and had previously been handcuffed and transported as a prisoner in vehicles operated by law enforcement officials.  *Id.* at 8:1-25; 35:25-36:14.

4.      Sunday, August 29, 2010, was similar to other days for Titus.  *Id.* at 13:13-14:5.  Titus slept until around 11:00 a.m., woke up, ate something, and then slept some more before going out with friends.  *Id.*

5.      Around four o'clock on August 29, 2010, Sundae McKown (McKown) and Stephen Schrader (Schrader) arrived at Titus' home.  *Id.* at 19:1-5.  Titus entered McKown's vehicle with McKown and Schrader and drove out into the country and came upon what appeared to be an abandoned farm house.  *Id.* at 18:21-19:24; 20:24-21:25.  The farm house was located in Stanton County, Nebraska, and belonged to the Wegner family.  **See** Filing No. 50-1 - Sheriff Unger Depo. p. 70:11-71:17.  James Shafer (Mr. Shafer), a neighbor, kept a lookout on the farm house.  *Id.* at 72:11-23.

6.      McKown parked in the driveway of the Wegner farm house and Schrader, McKown, and Titus went to the front door of the farm house, at which time, Schrader, finding the door locked, kicked it in.  **See** Filing No. 49-1 - Titus Depo. p. 20:24-23:3.  All three had been drinking beer.  *Id.* at 19:25-20:7.

7.      Mr. Shafer, after observing McKown's vehicle in the driveway, parked his vehicle behind McKown's, effectively blocking it in, removed the keys from McKown's vehicle, and informed McKown, Schrader, and Titus he was calling the cops.[4]  *Id.* at 23:9-21; 24:6-11; 26:6-15.  After 911 was called, Stanton County Deputy Mike Himburg (Deputy Himburg) called Sheriff Unger at home for assistance with the report of a break-in.  **See** Filing No. 50-1 - Sheriff Unger Depo. p. 67:5-68:19.  Sheriff Unger, who was off-duty, responded in civilian clothes in his marked Stanton County Sheriff's 2009 Ford Crown Victoria.  *Id.*  Sheriff Unger retrieved his weapon, which had his badge of office attached, and immediately responded to the location.  *Id.* at 68:17-19.

8.      McKown and Schrader were waiting with Mr. Shafer at the Wegner farm when Sheriff Unger arrived.  *Id.* at 71:22-72:10.  Titus had fled the scene on foot when

---

[4] Titus asserts Teri Shafer (Mrs. Shafer) called the police.  **See** Filing No. 67 - Response p. 1 (**citing** Filing No. 68-3, Ex. 2 - SCSO Incident Report).  The defendants argue Ex. 2 is hearsay.  **See** Filing No. 72 - Reply p. 3.  Whether Mr. Shafer or Mrs. Shafer called 911 is not material to the determination of this matter.

she heard Mr. Shafer called the Sheriff who was on his way to the Wegner farm. **See** Filing No. 49-1 - Titus Depo. p. 24:12-19. After shouting for Titus to come in and receiving no response, Sheriff Unger and Deputy Himburg transported McKown and Schrader to the Sheriff's Office. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 74:8-75:13. Sheriff Unger transported Schrader. *Id.* Sheriff Unger placed Schrader in the backseat with his seat belt on. *Id.* Sheriff Unger did not remember whether he placed Schrader in handcuffs. *Id.* Sheriff Unger drove around the Wegner farm in attempt to find Titus but was unsuccessful and eventually took Schrader to the Sheriff's Office for processing. *Id.* at 78:11-79:16.

9. As Titus fled the scene, Titus called her mother to come pick Titus up to leave the area. **See** Filing No. 49-1 - Titus Depo. p. 28:23-29:9. However, Titus did not know where she was and was unable to give her mother correct directions as to Titus' location. *Id.* at 29:10-30:4.

10. While Titus looked for a street sign or landmark to give her mother directions, Titus coincidentally returned to Mr. Shafer's residence and unwittingly requested directions or a ride to town from Mr. Shafer. *Id.* at 31:12-32:3. Titus left Mr. Shafer's residence after she overheard Mr. Shafer speak to a person on the phone she suspected was the Sheriff. *Id.* at 32:4-18.

11. Eventually, Sheriff Unger found Titus hiding in a ditch not far from the Shafer residence. *Id.* at 33:12-35:24. Sheriff Unger approached Titus, directed her toward his patrol car, placed her arms behind her back, handcuffed her, and placed her under arrest and in the back seat of his patrol car. *Id.* at 35:22-24; Filing No. 50-1 - Sheriff Unger Depo. p. 82:18-23. Titus did not resist. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 82:8-23. Sheriff Unger forgot to double lock the handcuffs on Titus. *Id.* at 101:5-24. The function of double locking is to prevent the handcuffs from tightening on the wrists if a suspect rotates or maneuvers in the cuff. *Id.* at 7:18-8:6. Most handcuffs have a device within the handcuff to either push or slide to engage the double lock. *Id.* Sheriff Unger did not use his own Peerless handcuffs to handcuff Titus because his were at his home. *Id.* at 19:11-15. Sheriff Unger used Deputy Himburg's Smith and Wesson handcuffs. *Id.* at 84:10-15. Deputy Himburg's handcuffs are different from Sheriff Unger's because Deputy Himburg's double lock button is on the

4

side whereas Sheriff Unger's handcuffs have the double lock button on the top where it is easy to press. *Id.* at 101:13-24.[5]

12. Sheriff Unger then went to speak with Mr. Shafer. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 86:5-22. Sheriff Unger's conversation with Mr. Shafer took around one minute. *Id.* at 88:12-17. During Sheriff Unger's conversation with Mr. Shafer, Sheriff Unger and Mr. Shafer noticed the rear door to Sheriff's Unger's patrol car open. *Id.* at 86:25-87:22. Sheriff Unger observed Titus appear to swing her legs out of the car. *Id.* Sheriff Unger approached his car, made sure Titus was in the back seat, placed the seat belt on Titus, physically pressed the back passenger door lock, shut the door, and went to the front passenger side and pressed the mechanical lock button to lock all four doors. *Id.*; Filing No. 49-1 - Titus Depo. p. 37:2-25.[6] Sheriff Unger's 2009 Ford Crown Victoria had traditional interior locks, door handles, and child restraint locks on the rear passenger door. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 60:12-62:6.

13. During Sheriff Unger's testimony at Titus' criminal hearing, Sheriff Unger testified he believed he placed a lap and shoulder seat belt on Titus. **See** Filing No. 71-1 - State v. Titus Tr. p. 23:21-24 ("I believe she was seat belted in but I cannot say beyond any doubt.").

14. After Sheriff Unger finished his conversation with Mr. Shafer, Sheriff Unger went to the driver's door and attempted to open the door but realized the door was locked. *Id.* at 88:12-23. Sheriff Unger used his key to manually unlock and open only the driver's door. *Id.* at 88:21-89:7. As Sheriff Unger drove to the Sheriff's Office, he called in his mileage and location. *Id.* at 89:25-92:8; Filing No. 68-5 - State v. Titus Tr. p. 13:4-6, 19-20.

---

[5] Titus contends the double locking procedure on Sheriff Unger's and Deputy Himburg's handcuffs were the same. **See** Filing No. 67 - Response p. 2. Titus cites the affidavit of Martin J. Pottebaum (Mr. Pottebaum), who Titus represents as an expert, wherein Mr. Pottebaum states the double locking procedure would have been the same. **See** Filing No. 68-4 - Pottebaum Aff. ¶ 2. Mr. Pottebaum's affidavit was subject to the defendants' Motion to Strike/Objection to Plaintiff's Expert Designation/First Supplemental Disclosures. **See** Filing No. 57. The defendants contend Mr. Pottebaum was disclosed beyond the deadline to disclose expert witnesses. **See** Filing No. 72 - Reply p. 3. The court denied the motion. **See** Filing No. 78 - Text Order. As explained in this order, Sheriff Unger's failure to double lock the handcuffs does not amount to deliberate indifference of Titus' safety. Therefore the question of whether Sheriff Unger's and Deputy Himburg's handcuffs are different is irrelevant.

[6] Titus testified she did not attempt to exit the patrol car but that the door did open and Sheriff Unger came back to the car to shut and lock the door. **See** Filing No. 49-1 - Titus Depo. p. 37:5-20.

5

15. Sheriff Unger also called the Norfolk Police Department (NPD) and told NPD to call Madison County Attorney's Office (MCAO) and give MCAO Sheriff Unger's cellphone number. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 93:3-94:2; Filing No. 49-1 - Titus Depo. p. 38:21-22, 41:15-16. Sheriff Unger wanted to speak with MCAO to determine whether Titus violated her bond restrictions and whether MCAO wanted her held when she would be cited for trespass and minor in possession. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 93:6-94:2.

16. As Sheriff Unger drove, he suddenly heard a "whooshing sound" and saw out of the corner of his eye as he looked back, a human figure tumbling from his patrol car. *Id.* at 94:7-24. At the time he was traveling about 55 m.p.h. southbound on Highway 57 and it was dark out. *Id.* at 94:18-95:1.

17. Sheriff Unger immediately stopped his vehicle and backed up to a point where he could see Titus sitting in a ditch. *Id.* at 95:7-19. He called Norfolk dispatch for an ambulance to his location. *Id.* at 94:3-6,104:2-8. He exited his vehicle, went to where Titus was in the ditch, and immediately administered a compress to Titus' bleeding forehead. *Id.* at 99:15-100:8. Sheriff Unger was an EMT captain of Stanton Rescue. *Id.* at 106:7.

18. Sheriff Unger observed the right handcuff was secured to Titus' right wrist but the left handcuff was open and not engaged. *Id.* at 100:25-101:4.

19. Sheriff Unger accompanied Titus to the Faith Regional Medical Center in Norfolk, Nebraska, by riding in the ambulance front passenger seat. *Id.* at 106:2-16.

20. Titus had a large laceration on her forehead, a fractured right ankle, which was placed in a soft cast, and cuts and abrasions, but she was cleared of any brain injury. **See** Filing No. 49-1 - Titus Depo. p. 54:8-55:10, 65:4-13.

21. Titus has no memory of how she exited Sheriff Unger's patrol car. *Id.* at 43:18-19.

22. According to October 19, 2010, medical records from Taylor Creek Physical Therapy, Titus' physical history provided:

> Pt was referred to outpatient for evaluation and Rx of Lt shoulder and elbow pain and soreness as well as for Rx to improve Rt ankle strength and ROM following a medial malleoli fracture. The pt reports that she was involved in a

6

> MVA on 8-29-10. At that time the pt states that she was arrested and handcuffed and placed in the back of a cop car after she had fled a party which the police had broken up. The pt states that the accident happened as a result of her falling out of the back sea[t] of a cop car and falling into a ditch while the car was going 55 mph. Pt states at that time fractured her Rt ankle and possibly her Rt big toe as per her report. She also states that since that time she has had soreness around her back and neck area extending into her Lt shoulder and Lt elbow. She states that she is unable to straighten her elbow currently and has trouble elevating her shoulder and lifting objects with the Lt arm. Pt states that she has had x-rays taken of her Lt shoulder and elbow that were considered negative for any fractures. The pt reports often times she feels pain and soreness radiating from her neck to her Lt shoulder as well as from her Lt elbow into her Lt thumb.

**See** Filing No. 49-1 - Titus Depo. Ex. 101.

23.     According to "Exhibit A" of Titus' Original Complaint, which is Titus' Notice of Claim sent to the Stanton County Board, Titus included the following information:

> I. Facts of the Case
> . . .
>
> B.     Incident Data:
>
> On August 29, 2010, Ashley Titus was detained by Sheriff Unger. Ashley was told that she was being arrested for trespassing and a "bond issue" in Madison County. Sheriff Unger was not in uniform and did not have a badge on his person, nor did he have it with him. Sheriff Unger placed Ashley in handcuffs, behind her back, and placed her in the car. Sheriff Unger has made the statement, under oath, that he did not follow the normal handcuff procedure in that he did not double lock the cuffs. Also, Sheriff Unger stated that he borrowed Deputy Himburg's handcuffs that evening. Ashley did not struggle or resist. Sheriff Unger began speaking to a bystander when he noticed the patrol car door had come open. Sheriff Unger manually locked the door and closed it once again. Sheriff Unger states that he manually pushed the lock on that door down, then went to the front driver's side and pushed the button to lock all the doors. Sheriff Unger believes that Ashley was seat-belted into the vehicle with a lap/shoulder belt. When Sheriff Unger was finished talking to the bystander, he went back to the patrol car, used the keys to unlock it, and entered the

>vehicle. Sheriff Unger began to transport Ashley to the Stanton County Jail.
>
>While transporting Ashley to the Stanton County Jail, Sheriff Unger was on his telephone. As Ashley and the Sheriff were traveling on Highway 75, Sheriff Unger heard a "whooshing sound" and glanced behind him to see Ashley rolling out of the back seat of the car. Sheriff Unger stated, in testimony given on December 2, 2010, that he was traveling at least 60 miles per hour at the time. Sheriff Unger immediately got on the radio and requested that rescue be immediately dispatched. Sheriff Unger then backed his car up and observed Ashley sitting in the ditch and bleeding form her forehead.
>
>According to the Stanton County Rescue records, the call was received from Sheriff Unger at 8:58 p.m. and Rescue arrived on scene at 9:10 p.m. When Rescue arrived, they discovered Ashley [ ] sitting in the ditch with a towel over her face. Ashley was treated on-scene and then transported to Faith Regional Hospital. Ashley arrived at the hospital at 9:53 p.m. . . .
>
>>IV. Conclusion
>>. . .
>
>Ms. Titus is not claiming this was the result of any malice; she simply views these events as an accident. Perhaps it was a mechanical malfunction. However, the fact remains that a prisoner was, somehow, ejected from a County vehicle traveling at 60 miles per hour and that prisoner suffered substantial injuries. It was an unfortunate accident, however, Stanton County needs to be responsible for the actions of the Sheriff's Department and pay appropriate damages. . . .

**See** Filing No. 1-1 - Ex. A - June 3, 2011, Notice of Claim.

    24.    According to Titus' answers to Interrogatories Response Nos. 12 and 14, Titus stated the following:

>INTERROGATORY NO. 12: Please describe fully how you entered or were otherwise placed in the police cruiser on August 29th, 2010 and how it came to pass you exited such police cruiser.
>
>ANSWER: To the best of my recollection, Sheriff Unger placed me in handcuffs. I was handcuffed with my hands behind my back. I did not struggle, or resist being handcuffed. Sheriff Unger placed me in the vehicle and spoke to bystander for a period of time. I do recall traveling

8

> down the highway and Sheriff Unger talking on his cellular telephone. I have no recollection of how I exited the police cruiser.
>
> INTERROGATORY NO. 14: If you have denied in whole in or part any of the Requests for Admission Nos. 1 through 8 separately served on you by Defendants in this matter, please provide a full and complete explanation of the basis for each and every denial or partial denial, as applicable.
>
> ANSWER: Plaintiff suffered head trauma during the accident and has no independent recollection of certain facts and circumstances leading to her exit from Sheriff Unger's vehicle. Plaintiff denied Request for Admission Nos. 5-8 because Plaintiff cannot admit to something she cannot recall.

**See** Filing No. 49-1 - Titus Depo. Ex. 101 p. 23, 25.

25. In Sheriff Unger's entire career in law enforcement, he has never had a prisoner escape or attempt to escape custody by jumping out of a moving vehicle. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 13:17-14:7.

26. Shortly after the accident, Sheriff Unger personally checked the locking mechanisms on the rear passenger door of his patrol car to ensure the locking mechanisms worked properly and confirmed the only way the rear door would open was if someone popped up the "peg lever" to unlock the door and manipulated the door handle mechanism. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 120:13-25.

27. The only written policy SCSO maintained regarding detention and transport of arrestees is a Safety Restraints Usage Policy. **See** Filing No. 48-1 - Unger Aff. ¶ 7; Filing No. 48-4 - Ex. C SCSO Safety Restraints Usage Policy.

28. Sheriff Unger is unaware of any required or mandated training or standards in law enforcement that require or even suggest child locks on the rear passenger door be engaged on a police patrol car while transporting an adult prisoner. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 42:22-43:6, 44:5-45:3.

29. Sheriff Unger is the elected Sheriff of Stanton County, and as such is responsible to his constituents. *Id.* at 3:13-15. Stanton County does not control the amount or nature of Sheriff Unger's training. *Id.* at 37:6-9. Sheriff Unger has gone through extensive training with the U.S. Army Military Police, the Nebraska Law

Enforcement Training Center, and NPD prior to becoming a Stanton County Deputy Sheriff, and fulfills continued education requirements. *Id.* at 6:9-7:10, 10:5-13:16, 17:3-18:16, 21:1-25:1, 118:18-25.

## CONTROVERTED FACTS

1. John Watson (Mr. Watson) of the Gutshall Insurance Agency in Norfolk, Nebraska, spoke with Titus after her accident at his office. **See** Filing No. 48-8 - Watson Aff. ¶¶ 1-5. Titus told Mr. Watson she recently sustained injuries when she "jumped out of a Sheriff's cruiser while it was moving down the highway." *Id.* Titus told Mr. Watson she did not know why she did this. *Id.*[7]

2. After Titus' accident occurred, the Stanton County Attorney prepared to charge Titus with "attempted escape" and requested Sheriff Unger to have a mechanic examine the locks on the patrol car. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 121:8-19. Sheriff Unger took the 2009 Ford Crown Victoria to Stanton Automotive and John Mandl (Mr. Mandl), a mechanic, examined the locking mechanisms. *Id.* at 121:19-20; Filing No. 48-5 Mandl Aff. ¶ 3. Mr. Mandl confirmed the locking mechanisms worked properly and had to be unlocked from the rear inside passenger compartment in order to open the rear door. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 121:21-122:4; Filing No. 48-5 Mandl Aff. ¶¶ 4-6.[8]

3. According to the medical records from the Norfolk Medical Group, Titus visited with Thomas M. Beutler, M.D. (Dr. Beutler), and his medical records provide as follows:

> This is a gal who jumped out of a cop car. She had multiple abrasions. Took all of the 30-some sutures out of her face. X-ray of her elbow and her shoulder as that is still hurting her and it did not show any fractures. Keep with range of motion exercises and see me next week.

**See** Filing No. 49-1 - Titus Depo. Ex. 101.

---

[7] Titus claims she did not visit Gutshall Insurance Agency after the accident and she does not know anyone by the name of John Watson. **See** Filing No. 67 - Response p. 4; Filing No. 68-2 - Titus Depo. p. 59-63.

[8] Titus objects to this paragraph because Titus has not had the opportunity to depose Mr. Mandl. **See** Filing No. 67 - Response p. 4.

10

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see ***Torgerson v. City of Rochester***, 643 F.3d 1031, 1042 (8th Cir. 2011). When making this determination, a court's function is not to make credibility determinations and weigh evidence, or to attempt to determine the truth of the matter; instead, a court must "determine whether there is a genuine issue for trial." ***Schilf v. Eli Lilly & Co.***, 687 F.3d 947, 949 (8th Cir. 2012). A court must "look to the substantive law to determine whether an element is essential to a case." ***Chambers v. Metro. Prop. & Cas. Ins. Co.***, 351 F.3d 848, 853 (8th Cir. 2003). Additionally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." ***Hervey v. County of Koochiching***, 527 F.3d 711, 719 (8th Cir. 2008). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [the rule] should be interpreted in a way that allows it to accomplish this purpose." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323-24 (1986).

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." ***Torgerson***, 643 F.3d at 1042 (alteration in original). Specifically, the moving party "must show that 'there is an absence of evidence to support the nonmoving party's case.'" ***Nitro Distrib., Inc. v. Alitcor, Inc.***, 565 F.3d 417, 427 (8th Cir. 2009) (**quoting** ***Celotex***, 477 U.S. at 325). In the face of a properly supported motion, the burden shifts to the nonmoving party to "respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." ***Torgerson***, 643 F.3d at 1042. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 252 (1986).

> If opposing parties tell two different stories, the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party-as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe them. A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor . . . without resort to speculation, conjecture, or fantasy[.]

**Reed v. City of St. Charles, Mo.**, 561 F.3d 788, 790-91 (8th Cir. 2009) (internal quotations and citations omitted). "Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to accept unreasonable inferences or sheer speculation as fact." **Id.** at 791 (internal quotation omitted).

## ANALYSIS

### A. Qualified Immunity

"A government official sued in his individual capacity may raise the defense of qualified immunity." **Sisney v. Reisch**, 674 F.3d 839, 844 (8th Cir. 2012). "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" **Stepnes v. Ritschel**, 663 F.3d 952, 960 (8th Cir. 2011) (**quoting Pearson v. Callahan**, 555 U.S. 223, 231 (2009)). When a defendant raises a qualified immunity defense a court looks at two prongs: "(1) whether or not the state actor deprived the complainant of a constitutional or statutory right, and (2) if there was a deprivation of such a right, whether or not the right was clearly established such that a reasonable person would have realized that his or her actions were unlawful." **Maness v. Dist. Court of Logan Cnty. N. Div.**, 495 F.3d 943, 945 (8th Cir. 2007); **see also Livers v. Schenck**, 700 F.3d 340, 350 (8th Cir. 2012).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." **Cnty. of Sacramento v. Lewis**,

523 U.S. 833, 851 (1998) (**citing** *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)). When an individual in custody is a pretrial detainee or arrestee, claims against government entities or officials for violations of the individual's rights are "properly analyzed under the due process clause of the Fourteenth Amendment." *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 905 (8th Cir. 1999). "The Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Spencer*, 183 F.3d at 906 (**quoting** *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "[A] prisoner's Eighth Amendment rights are violated when government entities or officials are deliberately indifferent . . . to his or her safety. *Spencer*, 183 F.3d at 905 (**citing** *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A government entity or official "cannot be found guilty of deliberate indifference unless it is shown that he "[knew] of and disregard[ed] an excessive risk to [an individual's] health or safety.'" *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (**quoting** *Farmer*, 511 U.S. at 837). "Deliberate indifference requires 'more than mere negligence,' but does not require acting 'for the very purpose of causing harm or with knowledge that harm will result.'" *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) (**quoting** *Farmer*, 511 U.S. at 835).

"[The Eighth Circuit] has previously held that failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health." *Fortner*, 518 F.3d at 558 (**citing** *Brown v. Morgan*, 39 F.3d 1184 (8th Cir. 1994)). In *Fortner*, an inmate filed a 42 U.S.C. § 1983 action against, among others, two correction officers, Fortner and Scott, involved in inmate transportation. *Fortner*, 518 F.3d at 556-57. The inmate alleged he sustained injuries when Fortner and Scott operated the transport vans recklessly and refused to buckle inmates' seat belts while knowing the inmates could not buckle themselves due to shackles and restraints. *Fortner*, 518 F.3d at 559-60. To determine whether the defendants violated the inmates' constitutional rights, the Eighth Circuit considered whether the facts alleged established "1) there was a substantial risk of harm to [an individual in custody] and 2) [the transporting officer] knew of and disregarded the substantial risk to [the individual in custody]." **See** *Fortner*, 518 F.3d at

13

558-59. The Eighth Circuit affirmed the district court's order denying Fortner's claim for qualified immunity because there was a substantial risk to the inmates and Fortner knew of and disregarded the substantial risk of harm.[9] *Id.* However, the Eighth Circuit reversed the denial of qualified immunity for Scott. *Id.* at 560-62. The court noted although Scott may have also driven in a reckless manner, Scott did not refuse a request to slow down and there was no evidence Scott knew the inmates were not in seat belts or the inmates were concerned for their safety. *Id.* The court held, with regard to Scott, "[w]ithout more than reckless driving, however, we cannot conclude that Scott's conduct amounted to deliberate indifference" and violated the inmates' constitutional rights. *Id.* at 560-61.

In *Morgan*, cited above by *Fortner*, Frederick H. Brown (Brown) filed a 42 U.S.C. § 1983 action alleging he was involved in an accident while a passenger in a car driven by a Pulaski County Sheriff's Deputy. *Morgan*, 39 F.3d at 1184. Brown alleged the "[Deputy] manifested deliberate indifference for his safety by refusing to let him wear a seat belt, driving at a high rate of speed in bad weather, refusing to slow down despite Brown's pleas for him to do so, purposely speeding up, and smiling when he saw that Brown was scared, asking, 'Are you scared?'" The district court dismissed Brown's action for failure to state a claim. *Id.* The Eighth Circuit reversed the district court and held the facts alleged in Brown's complaint were "sufficient to support a conclusion that [the Deputy] manifested deliberate indifference for [Brown's] safety, and thus entitle Brown to relief." *Id.*

In a context similar to the current action, in *Spencer*, a pretrial detainee was injured when, while handcuffed behind his back and being transported by police in a patrol car not equipped with safety restraints, he was thrown forward into the bulkhead of the car causing severe injuries and rendering him a quadriplegic. **See** *Spencer*, 183 F.3d at 904. Spencer asserted various claims against members of the Board of Police Commissioners of Kansas City, Missouri (Board) alleging:

> (1) the Board maintained an official policy of purchasing and using patrol wagons that were inherently unsafe; (2) the

---

[9] Fortner ignored the inmate passengers' request to slow down and was "driving in excess of the speed limit, following too closely to the lead van, crossing over double-yellow lines, and passing non-convoy cars when the road markings clearly prohibited doing so." *Fortner*, 518 F.3d at 559.

14

> Board had a policy of transporting intoxicated individuals with their hands handcuffed behind their back in these patrol wagons, even after it had notice that such policy was resulting in injuries; and (3) these policies constituted a form of punishment for pretrial detainees.

*Id.* The district court, using the deliberate indifference standard, granted summary judgment in the Board's favor and the Eighth Circuit affirmed. *Id.* The court held neither "the Board's purchase of patrol wagons without safety restraints nor its manner of transporting individuals in these wagons were policies that obviously presented a substantial risk of serious harm." *Id.* at 906. Additionally, the court found although the Board was aware of previous complaints of injuries sustained during transport, "the complaints d[id] not establish that the Board was deliberately indifferent to conditions that posed a substantial risk of serious harm." *Id.*

In the current matter before this court, the defendants argue Titus' allegations fail to include she made a specific request for safety restraints, which Sheriff Unger deliberately disregarded, or Sheriff Unger drove recklessly. **See** Filing No. 51 - Brief p. 13. The defendants argue the mere fact that Sheriff Unger did not take the specific precaution of engaging the child safety lock to prevent a passenger from opening the rear doors does not permit the inference of the existence of a substantial danger for the passenger or Sheriff Unger knew of any danger to the passenger. *Id.* The defendants contend there is nothing asserted in the First Amended Complaint or evidence to suggest Titus resisted or gave Sheriff Unger reason to believe Titus would attempt to escape his patrol car. *Id.* at 14.

Titus argues Sheriff Unger "stated repeatedly in his deposition that he believed [Titus] to be a flight risk" therefore he had the heightened obligation to secure Titus in his vehicle. **See** Filing No. 67 - Response p. 9. Titus contends Sheriff Unger should have double locked Titus' handcuffs, engaged the child safety locks on the passenger doors, and secured Titus in a seat belt. *Id.* at 9-10. Titus argues there is a genuine issue of material fact whether Sheriff Unger secured Titus' seat belt. *Id.* at 10. Titus contends in Titus' criminal pretrial conference, Sheriff Unger testified he did not know whether he secured Titus with a seat belt, but in Sheriff Unger's deposition testimony for

15

this case, Sheriff Unger stated he secured Titus with a seat belt. *Id.* Titus argues such an inconsistency creates a genuine issue of material fact. *Id.*

In order for this court to find Sheriff Unger's conduct demonstrated a deliberate indifference to Titus' safety and thus violated Titus' constitutional rights, the court must find Titus was at a substantial risk of harm and Sheriff Unger knew of and disregarded the substantial risk to Titus. The court finds Titus was not at a substantial risk of harm. Sheriff Unger took precautions to secure Titus safely in the patrol car. The court finds Sheriff Unger secured Titus' seat belt in accordance with SCSO's Safety Restraints Usage Policy. Sheriff Unger's testimony during Titus' criminal pretrial conference and his testimony at his deposition support this finding. The court does not find any inconsistency between Sheriff Unger's testimony that he "believe[d] [Titus] was seat belted in but [could not] say beyond any doubt" and his testimony during his deposition that after he noticed the door to his patrol car open, he ensured Titus was in the back seat and engaged Titus' seat belt. **See** Filing No. 71-1 - State v. Titus Tr. p. 23:21-24; Filing No. 50-1 - Sheriff Unger Depo. p. 86:25-87:22.[10] There being no evidence to the contrary, as Titus does not remember the incident, the court finds there is no genuine issue of material fact Sheriff Unger secured Titus in the back seat of the patrol car with a seat belt.

In addition to engaging the seat belt, although Sheriff Unger did not engage the child safety lock and double lock the handcuffs, Sheriff Unger placed Titus in handcuffs and locked the back passenger door. There is no evidence to suggest failure to double lock Titus' handcuffs subjected Titus to a substantial risk of harm.[11] The purpose of double locking is to prevent the handcuffs from tightening on the wrists if a suspect rotates or maneuvers in the cuff, not to prevent a passenger from falling out of a moving police car. **See** Filing No. 50-1 - Sheriff Unger Depo. p. 7:18-8:6. As for Titus' contention Sheriff Unger should have engaged the child safety locks, Sheriff Unger testified he has never engaged the child safety locks and there is no policy requiring the

---

[10] Titus also alleged in her Notice of Claim to Stanton County that "Sheriff Unger believes that Ashley was seat-belted into the vehicle with a lap/shoulder belt." **See** Filing No. 1-1 - Titus' Notice of Claim to Stanton County p. 2.

[11] Even assuming failure to double lock Titus' handcuffs subjected Titus to a substantial risk of harm, there is no evidence Sheriff Unger knew of and disregarded such a risk.

16

Sheriff to engage the child locks. Sheriff Unger had no reason to believe child safety locks were necessary.

Even assuming Titus was unbuckled, in addition to having the double locking feature on the handcuffs and child locks disengaged, there are no other allegations or facts to support a finding that Titus was at a substantial risk of harm. Unlike ***Fortner*** and ***Morgan***, there are no allegations Sheriff Unger drove recklessly, that Titus requested Sheriff Unger engage her seat belt or expressed concern for her safety, or that Sheriff Unger knew of a risk to Titus and disregarded the risk. The court agrees with Titus to the extent "she simply views these events as an accident" and it "was an unfortunate accident." **See** Filing No. 1-1 - Ex. A - June 3, 2011, Notice of Claim. Nevertheless, an accident or mere negligence does not constitute deliberate indifference.

Additionally, the evidence does not support Titus' argument that Sheriff Unger "stated repeatedly" Titus was a flight risk. On the contrary, Titus did not resist at all. **See, e.g.,** Filing No. 1-1 - Titus' Notice of Claim to Stanton County p. 2 ("Ashley did not struggle or resist."); Filing No. 49-1 - Titus Depo. Ex. 101 p. 23 - Titus' Answer to Interrog. 12 ("I did not struggle, or resist being handcuffed."). The evidence shows Sheriff Unger was not on any notice Titus would attempt to escape a moving vehicle.

Considering the facts in the light most favorable to Titus, the evidence demonstrates Sheriff Unger took care in securing Titus in the back passenger seat of his patrol car. Sheriff Unger placed Titus in handcuffs, engaged Titus' seat belt, and locked the doors. Even though the child safety lock was disengaged and Titus' handcuffs were not double locked, without more, this court cannot conclude Sheriff Unger's conduct demonstrated a deliberate indifference to Titus' safety. Because the court finds Sheriff Unger's conduct did not violate Titus' constitutional rights, the court need not to address whether any such right was clearly established. Accordingly, Sheriff Unger is protected from suit by qualified immunity.

## B.     Policy, Custom, or Habit and Failure to Train

The defendants argue Counts I, VI, and VII of Titus' First Amended Complaint allege some unlawful "policy, custom, or habit" or "failure to train or supervise." **See**

Filing No. 51 - Brief p. 18. The defendants argue Titus included Counts I, VI, and VII in an attempt to establish liability under *Monell*. The defendants contend since Sheriff Unger did not commit an underlying constitutional violation, a municipality may not be held liable for failure to train or for a policy, custom, or habit claim. *Id.* at 19. The defendants also argue the Sheriff is not a policymaker. *Id.* (**citing *Poor Bear v. Nesbitt***, 300 F. Supp. 2d 904 (D. Neb. 2004)). Lastly, the defendants assert a Sheriff is an elected official of the citizens and the Sheriff's duties are prescribed by the legislature under Nebraska law, with his training requirements prescribed by the State Legislature rather than Stanton County, as such, Stanton County cannot be held liable for a purported "failure to train." *Id.* Titus does not respond to the defendants' arguments.

"[I]n order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." ***Cooper v. Martin***, 634 F.3d 477, 481-82 (8th Cir. 2011). Because Sheriff Unger is entitled to qualified immunity, and therefore there is no individual liability, Titus cannot maintain her purported *Monell* claims (Counts I and VII). Additionally, although Sheriff Unger is an elected official and Stanton County does not prescribe the Sheriff's training requirements, assuming Stanton County was responsible for Sheriff Unger's training, Titus' claim for failure to train or supervise claim (Count VI) cannot be sustained absent an underlying constitutional violation by Sheriff Unger. **See *Sitzes v. City of W. Memphis Ark.***, 606 F.3d 461, 470-71 (8th Cir. 2010).

## C. Negligence

The defendants argue, in the event the court finds the defendants are entitled to qualified immunity, the court should decline jurisdiction over Titus' state law claims or dismiss Titus' negligence claims. **See** Filing No. 51 - Brief p. 14. The defendants argue Titus' second count in the First Amended Complaint for negligence fails because Titus has not produced evidence of a duty or breach of such duty. *Id.* at 14-15. Additionally, the defendants argue Titus' negligence claim cannot survive because there was an intervening cause to break the chain of causation: Titus' attempted escape from custody. *Id.* at 16-17. In response, Titus argues the issue of comparative fault is a

question for the trier of fact and not appropriately addressed through summary judgment. **See** Filing No. 67 - Response p. 14-15.

"In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages." **Blaser v. Cnty. of Madison**, 826 N.W.2d 554, 563 (Neb. 2013); **see also Connelly v. City of Omaha**, 816 N.W.2d 742, 753 (Neb. 2012) (stating a "negligence action brought under the [Political Subdivisions Tort Claims Act] has the same elements as a negligence action against an individual, i.e., duty, breach of duty, causation, and damages"). Titus has not indicated a statute required Sheriff Unger to engage the child safety locks or double lock the handcuffs. Although SCSO had an internal policy that passengers in a patrol car have a seat belt engaged, as previously explained, Sheriff Unger engaged Titus' seat belt. The issue of comparative fault need not be addressed because Sheriff Unger did not breach any duty toward Titus.

**D. Discovery**

Titus argues inadequate discovery has been obtained and therefore the court should delay ruling on the defendants' summary judgment motion. **See** Filing No. 67 - Response p. 11-17. Titus argues she learned of several potential fact witnesses during Sheriff Unger's deposition and Titus needs to depose such witnesses. **Id.** Titus argues she did not learn the extent of discoverable knowledge Deputy Himburg, Deputy Kent Kuchera (Deputy Kuchera), and Mr. Shafer had until Sheriff Unger's deposition and Sheriff Unger did not disclose Mr. Mandl, Mr. Watson, and Mr. Gutshall, the owner of Gutshall Insurance Agency. **Id.** The defendants argue Titus has not made the requisite showing sufficient to delay ruling on the summary judgment motion. **See** Filing No. 72 - Reply p. 12-14.

Titus has not shown "specified reasons, [she] cannot present facts essential to justify [her] opposition." **See** Fed. R. Civ. P. 56(f); **Marksmeier v. Davie**, 622 F.3d 896, 903 (8th Cir. 2010) (affirming denial of motion for enlargement of time because the party did not allege specific facts further discovery might unveil that would establish a genuine issue of material fact). First, Titus was aware of Deputy Himburg, Deputy Kuchera, and Mr. Shafer through discovery disclosures. Second, information Mr. Mandl, Mr. Watson,

and Mr. Gutshall may have appears to be relevant to what occurred *after* Titus' accident, thus it does not affect issues relevant to the question of qualified immunity. The court has the necessary information, specifically Sheriff Unger's and Titus' deposition testimony, to determine the facts in dispute. A delay to allow additional discovery is unnecessary. **See *Marksmeier***, 622 F.3d at 903 ("Generally, qualified immunity operates to protect governmental officials not only from the burdens of trial but also from the burdens of discovery.").

**IT IS ORDERED**:

1. The defendants' Motion for Summary Judgment (Filing No. 47) is granted.
2. Titus' claims against Sheriff Unger and Stanton County, Nebraska, are dismissed.
3. The defendants' Motion for Protective Order (Filing No. 74) is denied as moot.
4. Pursuant to Fed. R. Civ. P. 58, a separate judgment will be entered on this date in accordance with this Order.

Dated this 4th day of November, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge